United States Court of Appeals
for the Fourth Circuit
No. 18-4789

_____

United States,
Appellee,
v.

Jovon Medley,
Appellant.

_____

Appeal from the United States District Court
for the District of Maryland

_____

**Appellant's Opening Brief**


James Wyda
Federal Public Defender

Cullen Macbeth
Assistant Federal Public Defender
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD
(410) 962-3962
cullen_macbeth@fd.org

Counsel for Appellant

# Table of Contents

Table of Authorities. ............................................................ iv

Jurisdictional Statement .........................................................1

Issues Presented ...................................................................2

Statement of the Case ...........................................................2

A.    Mr. Medley's arrest..........................................................2

B.    Indictment in D.C. ..........................................................4

C.    Interrogation of Mr. Medley ...........................................4

D.    Federal indictment and motion to suppress............................7

E.    Guilty plea in D.C. Superior Court ...................................9

F.    Federal trial......................................................................9

        1.    Evidence of carjacking .......................................9

        2.    Firearms evidence .............................................12

        3.    Cell phone evidence .........................................20

        4.    Verdict ...............................................................25

G.    Sentencing........................................................................26

Summary of the Argument.......................................................28

i

Argument ...................................................................................................30

A.    Admission of Mr. Medley's statements to Detective Dalton violated
      his Sixth Amendment right to counsel ....................................................30

      1.    Standard of review ...........................................................................30

      2.    Applicable law ..................................................................................30

      3.    Analysis .............................................................................................34

            a.    The government did not show Mr. Medley waived his
                  Sixth Amendment right to counsel. ...................................35

            b.    The D.C. offense is the same offense as the
                  felon-in-possession offense of which Mr. Medley was
                  found guilty in the District of Maryland ..........................45

                  i.    The D.C. offense has the same elements as the
                        federal federal-in-possession statute ......................45

                  ii.   The D.C. Superior Court case was prosecuted by
                        the same sovereign as the District of Maryland
                        case. ..........................................................................50

            c.    This Court should vacate Mr. Medley's conviction and
                  remand for a new trial. .......................................................53

B.    The district court erred by finding Mr. Medley used the firearm in
      connection with another felony .................................................................56

      1.    Standard of review ...........................................................................56

      2.    Analysis .............................................................................................56

C.      The district court violated Mr. Medley's Sixth Amendment right to a jury trial by sentencing him based on acquitted conduct………………………………….............................................64

Conclusion...........................................................................................66

Statement Regarding Oral Argument ................................................68

Certificate of Compliance ..................................................................69

Certificate of Service ..........................................................................70

iii

# Table of Authorities

## Federal Cases

*Berghuis v. Thompkins*, 560 U.S. 370 (2010) ..........................................................6

*Blockburger v. United States*, 284 U.S. 299 (1932) ......................................passim

*Brown v. Ohio*, 432 U.S. 161 (1977).....................................................................48

*Burket v. Angelone*, 208 F.3d 172 (4th Cir. 2000)...................................................6

*Edwards v. Arizona*, 451 U.S. 477 (1981) .............................................................31

*Ellison v. Sachs*, 769 F.3d 955 (4th Cir. 1985) .....................................................61

*Ferguson v. City of Charleston, S.C.*, 308 F.3d 380 (4th Cir. 2002) ....................37

*Gore v. Sec'y for Dep't of Corrs.*, 492 F.3d 1273 (11th Cir. 2007).......................41

*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) ..........................52

*Iowa v. Tovar*, 541 U.S. 77 (2004) ........................................................................32

*Maryland v. Shatzer*, 559 U.S. 98 (2010) ........................................................ 32, 39

*McNeil v. Wisconsin*, 501 U.S. 171 (1991) ...................................................... 40, 41

*Miranda v. Arizona*, 384 U.S. 436 (1966) .....................................................passim

*Montejo v. Louisiana*, 556 U.S. 778 (2009) ...................................................passim

*Patterson v. Illinois*, 487 U.S. 285 (1988)....................................................... 31, 38

*Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863 (2016)............................... 50, 51, 52

iv

*Robinson v. Polk*, 438 F.3d 350 (4th Cir. 2006)......................................................64

*Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191 (2008).............................................33

*Rutledge v. United States*, 517 U.S. 292 (1996).....................................................48

*Sam's Club v. N.L.R.B.*, 173 F.3d 233 (4th Cir. 1999)...........................................61

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)....................................................33

*Texas v. Cobb*, 532 U.S. 162 (2001) ................................................................. 34, 45

*United State v. Slager*, 912 F.3d 224 (4th Cir. 2019)..............................................57

*United States Ass'n of Reptiles Keepers, Inc. v. Zinke*, 852 F.3d 1131 (D.C. Cir.

   2017) ......................................................................................................................52

*United States v. Alvarado*, 440 F.3d 191 (4th Cir. 2006)........................................50

*United States v. Bell*, 808 F.3d 926 (D.C. Cir. 2015) ..............................................65

*United States v. Benjamin*, 711 F.3d 371 (3d Cir. 2013) ........................................49

*United States v. Blair*, 661 F.3d 755 (4th Cir. 2011)..............................................33

*United States v. Cain*, 524 F.3d 477 (4th Cir. 2008)...............................................30

*United States v. Coleman*, 588 F.3d 816 (4th Cir. 2009) ........................................37

*United States v. Dillard*, 214 F.3d 88 (2d Cir. 2000) .............................................49

*United States v. Dixon*, 509 U.S. 688 (1993) .................................................... 46, 48

*United States v. Ductan*, 800 F.3d 642 (4th Cir. 2015) .................................... 33, 44

v

*United States v. Garcia-Lagunas*, 835 F.3d 479 (4th Cir. 2016).................. 53, 55

*United States v. Giddins*, 858 F.3d 870 (4th Cir. 2017).........................................32

*United States v. Gilbert*, 430 F.3d 215 (4th Cir. 2005) .........................................47

*United States v. Goodwin*, 552 F. App'x 541 (6th Cir. 2014) .............................49

*United States v. Gordon*, 895 F.2d 932 (4th Cir. 1990) ................................. 33, 45

*United States v. Holness*, 706 F.3d 579 (4th Cir. 2013)...............................passim

*United States v. Jinwright*, 683 F.3d 471 (4th Cir. 2012) ....................................66

*United States v. Johnson*, 400 F.3d 187 (4th Cir. 2005)................................. 33, 44

*United States v. Kennedy*, 372 F.3d 686 (4th Cir. 2004) ......................................35

*United States v. Lentz*, 524 F.3d 501 (4th Cir. 2008)..................................... 31, 35

*United States v. Maxim*, 55 F.3d 394 (8th Cir. 1995)..........................................48

*United States v. Mir*, 525 F.3d 351 (4th Cir. 2006) ..............................................33

*United States v. Owen*, 407 F.3d 222 (4th Cir. 2005)...........................................36

*United States v. Robertson*, 810 F.2d 254 (D.C. Cir. 1987) ................................53

*United States v. Shephard*, 892 F.3d 666 (4th Cir. 2018).....................................56

*United States v. Span*, 789 F.3d 320 (4th Cir. 2015) ...........................................56

*United States v. Sumler*, 136 F.3d 188 (D.C. Cir. 1998).......................................53

*United States v. Umana*, 750 F.3d 320 (4th Cir. 2014).........................................60

*United States v. Watts*, 519 U.S. 148 (1997)............................................................66

*United States v. Weathers*, 186 F.3d 948 (D.C. Cir. 1999) ...............................52

*United States v. Wilkinson*, 590 F.3d 259 (4th Cir. 2010) ....................................64

## Other Cases

*Dorsey v. United States*, 154 A.3d 106 (D.C. 2017)..............................................46

*United States v. Jones*, 127 A.3d 1173 (D.C. 2015)..............................................49

*Myers v. United States*, 56 A.3d 106 (D.C. 2017)..................................................46

## Federal Statutes

18 U.S.C. § 2119(2) .................................................................................................7

18 U.S.C. § 3231 ......................................................................................................1

18 U.S.C. § 3742 ......................................................................................................1

18 U.S.C. § 922(g)(1) ..........................................................................................7, 47

18 U.S.C. § 924(c)(1)(A)(iii) ...............................................................................7, 8

28 U.S.C. § 1291.......................................................................................................1

## Other Statutes

22 D.C. Code § 4503(a)(1), (b)(1) .......................................................................9, 46

**Other Sources**

Obliteride, Men's Sizing, http://www.obliteride.org/pdfs/voler-sizing-

    charts (last visited Mar. 4, 2019 ........................................................58

U.S. Const. art. I, § 8, cl. 17 ................................................................52

**U.S. Sentencing Guidelines**

U.S.S.G. § 2K2.1(a)(4)(A) .................................................................26

U.S.S.G. § 2K2.1(b)(6)(B) ................................................... 26, 57, 66

# Jurisdictional Statement

The district court had jurisdiction over this criminal case under 18 U.S.C. § 3231.  The court entered judgment on October 11, 2018, sentencing Appellant Jovon Medley to 78 months in prison and three years of supervised release.  J.A. 2743-45.[1]

Mr. Medley filed a timely notice of appeal on October 24, 2018.  J.A. 2752.  This Court's jurisdiction arises under 18 U.S.C. § 3742 and 28 U.S.C. § 1291.

---

[1] The Joint Appendix is cited as "J.A.," followed by the page number. The Sealed Joint Appendix is cited as "S.J.A.," followed by the page number.

## Issues Presented

1.    Whether, at Mr. Medley's trial for being a felon in possession of a firearm, the district court violated Mr. Medley's Sixth Amendment rights by admitting uncounseled statements he made to police after being appointed counsel in another case brought by the same sovereign for the same offense.

2.    Whether the district court erred by enhancing Mr. Medley's sentence based on a finding that he used the firearm in connection with another felony offense.

3.    Whether the district court violated Mr. Medley's Sixth Amendment right to a jury by sentencing him on the basis of acquitted conduct.

## Statement of the Case

### A.    Mr. Medley's arrest

Around 9 p.m. on December 31, 2016, Officer Michael Ashley, a member of the District of Columbia Metropolitan Police Department (MPD), observed three men standing together on the sidewalk as he and two other officers drove up 37th Place, Southeast.  J.A. 155-57, 162.  One of the men, later identified as Mr. Medley, looked at Officer Ashley's police car, made eye contact with the officers, and began to "separate himself" from his companions.  J.A. 157, 163.  Officer Ashley and his partner got out

of the car and attempted to make contact with Mr. Medley, calling out, "hey, police, hey, police." J.A. 157. Mr. Medley continued to walk away from the scene. J.A. 157-58. He looked back over his shoulder and, after the officers began jogging in pursuit, ran toward a house at 290 37th Place. J.A. 158-59. While running, Mr. Medley had his right hand on his waistband, as though to hold up his pants. J.A. 158.

Mr. Medley entered the house at 290 37th Place, but, pursuant to MPD policy, officers stopped outside the front door when they observed a dog coming toward them from inside the home. J.A. 165-66. After about five minutes, as the officers were searching for a snare to "contain[]" the dog, Mr. Medley emerged from the house. J.A. 166, 169, 195. Officer Ashley then seized Mr. Medley and placed him in handcuffs. J.A. 198-99.

Once the dog was contained, MPD Sergeant Curt Sloan spoke with the home's leaseholder, a man in a wheelchair who had been sitting on his front porch when Mr. Medley entered the house. J.A. 231-32. The owner, who claimed he did not know Mr. Medley, gave officers consent to search his home. J.A. 233, 238-39. In a plastic bin in one of the home's bedrooms, officers found a 1911 Rock Island Armory .45-caliber semi-automatic pistol.

3

J.A. 275.  The officers arrested Mr. Medley and took him to D.C. jail for booking.  J.A. 276.

### B.    Indictment in D.C.

On January 2, 2017, Mr. Medley was charged in D.C. Superior Court with one count of carrying a dangerous weapon and one count of unlawfully possessing a firearm.  J.A. 123.  The latter count alleged that on December 31, 2016, Mr. Medley possessed the Rock Island Armory in D.C. after having previously been convicted of a crime punishable by more than one year in prison.  J.A. 1557-58.

The Superior Court appointed a local attorney, Veta Carney, to represent Mr. Medley at his presentment on January 2nd.  J.A. 123.  Three days later, at a preliminary hearing, the court terminated Ms. Carney's appointment at Mr. Medley's request and replaced her with Kevin McCants, an attorney who had represented Mr. Medley in a previous case. J.A. 123, 564, 596, 1577.

### C.    Interrogation of Mr. Medley

Sometime in January 2017, Detective Darren Dalton of the Prince George's County Police Department (PGCPD), who was investigating a

4

recent armed carjacking in Maryland, received notice from his lieutenant

that shell casings found at the scene had been linked to the Rock Island

Armory recovered during Mr. Medley's arrest.  J.A. 331.  Detective Dalton

looked up Mr. Medley's D.C. case in Judiciary Case Search, a website that

contains docket entries and other information about criminal cases.  J.A.

372-74.  From that website, Detective Dalton learned Mr. Medley was being

held without bond at the D.C. Department of Corrections pending trial in a

firearms-related D.C. Superior Court case.  J.A. 335, 374-75.

Detective Dalton and two other PGCPD detectives traveled from

Prince George's County, which is in Maryland, to the D.C. jail to interview

Mr. Medley on January 31, 2017.  J.A. 335.  Detective Dalton began the

interview by requesting Mr. Medley's biographical information (e.g., date

of birth and work history), introducing himself as a PGCPD detective, and

explaining that he wished to speak to Mr. Medley about the guns with

which he was arrested.  J.A. 339, 377, 1888.  He said he was "not from the

Metropolitan Police Department for D.C." and "was there not to speak to

[Mr. Medley] in reference to the details of his arrest in D.C."  J.A. 378, 1888.

Rather, Detective Dalton told Mr. Medley that he "w[as] only there to

5

speak to [Mr. Medley] about [the] investigation in Maryland," which pertained to a carjacking. J.A. 378. He assured Mr. Medley he "w[as]n't worried about the D.C. case." J.A. 1888.

Detective Dalton then informed Mr. Medley of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Mr. Medley indicated he understood.[2] J.A. 339-41. Detective Dalton never brought up the lawyer appointed to represent Mr. Medley in his D.C. case, nor did he ask whether Mr. Medley wished to have that attorney present during the interrogation. J.A. 380, 385. According to Detective Dalton, Mr. Medley did not mention that he was represented in his D.C. case or say that he wished to stop talking so he could consult a lawyer. J.A. 346.

---

[2] Citing the Fifth Amendment's privilege against self-incrimination, the Supreme Court held in *Miranda* that statements a defendant makes while subject to custodial interrogation are admissible at trial only if police first warn him that he has the right to remain silent, that anything he says can be used against him in court, that he has the right to the presence of an attorney, and that an attorney will be appointed for him if he cannot afford one. *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010) (citing *Miranda*, 384 U.S. at 479). *Miranda* established what courts refer to as the "Fifth Amendment right to counsel." *Burket v. Angelone*, 208 F.3d 172, 197 (4th Cir. 2000).

In response to questioning, Mr. Medley said he purchased the Rock Island Armory approximately four days before his arrest on December 31st. J.A. 347, 1871. He told Detective Dalton the transaction occurred in the area of Columbia Park Road and Columbia Terrace, which is in Landover, Maryland. J.A. 1871. Mr. Medley also said no one else possessed the gun between the time he bought it on December 27th and the time he was arrested on the 31st. J.A. 379-80, 1871-72.

## D.    Federal indictment and motion to suppress

On May 8, 2017, a federal grand jury in the District of Maryland returned an indictment charging Mr. Medley with one count of carjacking resulting in serious bodily injury, under 18 U.S.C. § 2119(2); one count of using and discharging a firearm during and in relation to a crime of violence, under 18 U.S.C. § 924(c)(1)(A)(iii); and one count of being a felon in possession of a firearm and ammunition, under 18 U.S.C. § 922(g)(1). J.A. 1-4. The latter count alleged that "[o]n or about December 30, 2016, in the District of Maryland," Mr. Medley possessed the Rock Island Armory model M1911-A1 .45-caliber semi-automatic firearm that police recovered

7

from 290 37th Place.  J.A. 4.  This firearm was the same firearm Mr. Medley

was charged with possessing in his D.C. Superior Court case.  J.A. 1557-58.

On June 20, 2017, Mr. Medley filed a motion to suppress various

pieces of evidence, including, relevant here, the statements he made to

PGCPD detectives at the D.C. jail.  J.A. 8-9.  He contended police obtained

those statements "in violation of . . . his right to counsel as guaranteed by

the Fifth and Sixth Amendments to the United States Constitution."  J.A. 8.

The district court held an evidentiary hearing, at which it received

testimony from Detective Dalton.  J.A. 328-95.

The court denied Mr. Medley's motion, holding officers did not

violate his Fifth Amendment right to counsel because Detective Dalton

delivered *Miranda* warnings and Mr. Medley voluntarily waived his rights

by choosing to answer questions without an attorney present.  J.A.593-96.

As to the Sixth Amendment, the court held, citing *Montejo v. Louisiana*, 556

U.S. 778 (2009), that Mr. Medley's waiver of his *Miranda* rights also effected

a waiver of his Sixth Amendment right to counsel.  *See* J.A. 596-600.  Thus

even though Mr. Medley had already been appointed counsel in his D.C.

case, the court ruled, his statements to Detective Dalton were admissible

8

because Mr. Medley freely chose to answer questions in the absence of his attorney.  J.A. 596-600.

### E.    Guilty plea in D.C. Superior Court

On October 23, 2017, Mr. Medley pled guilty in D.C. Superior Court to one count of being a felon in possession of a firearm, under 22 D.C. Code § 4503(a)(1), (b)(1).  J.A. 1557-58, 1563, 1566-67, 1573.  The prosecution proffered that, had the case proceeded to trial, it would have proved that Mr. Medley possessed the Rock Island Armory in D.C. on December 31, 2016.  J.A. 1568-69.  Mr. Medley agreed these facts were true and correct. J.A. 1569.

### F.    Federal trial

At a five-day trial beginning on June 18, 2018, the jury heard the following evidence.

#### 1.    Evidence of carjacking

Elton Wright lives in an apartment complex at the intersection of Southern Avenue and Suitland Road in Prince George's County, Maryland, just over the border from D.C.  J.A. 1803, 2436.  He testified that around 11:15 a.m. on December 30, 2016, as he was walking from his apartment to

9

the parking lot where his car was parked, a man in black clothes and a mask approached him. J.A. 1813-15. The man pointed a gun at Mr. Wright and demanded the keys to his car, a black BMW. J.A. 1805, 1815, 2455. When Mr. Wright turned and ran back to his apartment, the masked man pursued him, firing shots as he ran. J.A. 1815-16. Two of the bullets hit Mr. Wright in the knee, causing him to fall to the ground. J.A. 1815-16.

The masked man walked up to Mr. Wright, who was lying on the ground outside the entrance to his building, and once again demanded the keys to his car. J.A. 1816. This time, Mr. Wright handed over the keys, and the man took off running. J.A. 1816-17. Other witnesses reported seeing Mr. Wright's car pull out of the apartment complex shortly thereafter. J.A. 1705, 1718.

Mr. Wright, who grew up in the Ridge Road area of D.C., testified he continued to visit friends who lived in the area after he moved to Maryland. J.A. 1810-11. While visiting those friends, he became familiar with Mr. Medley, who also hung out in the area. J.A. 1812-13. Mr. Wright, who had known Mr. Medley for about three years by the time of trial, said he used to see Mr. Medley two to three times per week. J.A. 1822. He had

10

had conversations with Mr. Medley in the past and said it would be "easy" for him to recognize Mr. Medley if they encountered one another in public. J.A. 1823.

Despite his familiarity with Mr. Medley, Mr. Wright testified he had never before seen the man who shot him. J.A. 1826. He did not recognize the man's walk and, despite having talked with Mr. Medley before, did not recognize the man's voice, either. J.A. 1828-29. Mr. Wright testified he was about the same size as the shooter, whom he characterized as "bulky" and whose body size he said he had an opportunity to observe. J.A. 1834-35, 1843. At the time of shooting, Mr. Wright wore a size-44 pants; Mr. Medley weighed somewhere between 155 and 170 pounds. J.A. 1843; S.J.A. 2961. Mr. Wright agreed Mr. Medley is "[m]uch smaller" than Mr. Wright. J.A. 1842.

Others who saw the shooter also offered descriptions that did not match Mr. Medley. According to Detective Dalton, witnesses reported the shooter as being a "dark-skinned" black male, weighing somewhere between 200 and 250 pounds, and standing 5'11" to 6'2". J.A. 1890-91, 1912-14. Mr. Medley is between 5'9" and 5'10". S.J.A. 2961. Shawna

11

Denton, who lived in a building across the street from Mr. Wright's apartment, said the shooter was "of darker complexion."  J.A. 1714, 1719. By contrast, Mr. Wright characterized Mr. Medley as "light-skinned," and his ex-girlfriend, Sharon Jackson, described him as "skinny."  J.A. 1837, 1935.

On January 9, 2017, police discovered Mr. Wright's car in the 4800 block of Texas Avenue, Southeast, in D.C.  J.A. 1852-53.

### 2.    Firearms evidence

Officer Ashley and Sergeant Sloan testified to the events of December 31, 2016, including MPD officers' attempt to approach Mr. Medley on the sidewalk, his retreat into the home at 290 37th Place, and their discovery of the Rock Island Armory inside the house.  J.A. 1613-29, 1652-70.  The parties stipulated that Mr. Medley had been convicted in D.C. Superior Court of possessing that firearm in D.C. on the 31st.  J.A. 1682-83, 2427-28. The government also solicited testimony from Detective Dalton that, during his interview at the D.C. jail, Mr. Medley said: (1) he purchased the Rock Island Armory in Landover, Maryland, four days before his arrest on

the 31st; and (2) no one else possessed the gun between the time Mr.

Medley bought it and the time he was arrested.  J.A. 1871-72.

In an effort to link the Rock Island Armory to the carjacking of Mr.

Wright on the 30th, the government called Scott McVeigh, an examiner

with the PGCPD's firearms examination unit, whom the district court

qualified as an expert in firearm toolmark analysis.  J.A. 2118-19, 2128.  Mr.

McVeigh described the process of projecting a bullet from a gun,

explaining that as the bullet travels down the gun's barrel, it comes in

contact with lands and grooves, i.e., cuts or impressions in the barreling

created by the manufacturing process.  J.A. 2135-37.  He testified that the

lands and grooves, in turn, leave marks on the bullet as it is expelled.  J.A.

2137-40.  The field of forensic firearm analysis attempts to match bullets or

shell casings from a crime scene to a particular gun by comparing the

marks on the recovered evidence—known as "toolmarks"—with marks on

a bullet test-fired from the gun in question.  J.A. 2140-42.

According to Mr. McVeigh, these toolmarks fall into three categories.

Class characteristics, the most general category, are marks unique to a

particular model of gun.  J.A. 2137-38.  All bullets fired from 12-gauge

13

shotguns, for instance, will bear certain features in common, which are different from the features on bullets fired from other types of guns. J.A. 2137. Subclass characteristics "are those characteristics that are associated with a certain tool in a factory." J.A. 2142. For example, all bullets fired from 12-gauge shotguns produced by a specific machine, at a specific factory, will have additional features in common. *See* J.A. 2142. Finally, individual characteristics are "associated with a particular firearm." J.A. 2138.

Mr. McVeigh testified, on cross-examination, that when two items are fired from the same weapon, he would "expect to see things that [a]re dissimilar between them." J.A. 2186. And when two items are fired from different weapons, they "are going to have some patterns that seem similar." J.A. 2187.

At the request of the MPD, Mr. McVeigh said, he fired two shots from the Rock Island Armory into a water tank and then placed the bullets and shell casings under a microscope next to evidence from the scene of the carjacking. J.A. 2147-50; *see* J.A. 1749, 1752-53. Mr. McVeigh testified that the class characteristics of the cartridge cases he compared were "in

14

complete agreement." J.A. 2163. But he offered no opinion as to the items'

relative subclass characteristics, and his conclusions about their individual

characteristics were limited to a finding of "consistency" or "agreement" at

a handful of places on the items. *E.g.*, J.A. 2161, 2173, 2179, 2182. Mr.

McVeigh did not opine that the bullets test-fired from the Rock Island

Armory were a match to the bullets found outside Mr. Wright's apartment.

The government introduced photographs taken from Mr. McVeigh's

microscope that showed side-by-side comparisons of the recovered and

test-fired ammunition. J.A. 2154, 2554-58. Mr. McVeigh walked the jury

through these photos, explaining for each one where he saw "consistency

in the patterns" of the two items' toolmarks. J.A. 2160-62, 2165-68, 2172-74,

2177-78, 2181-83. On one photo (reproduced below), for example, he

pointed to the comparator shell casings and identified the point where "the

pattern starts to come into alignment and agreement." J.A. 2168.

15



J.A. 2557.

But Mr. McVeigh acknowledged that many of the photos showed "breaks" in the supposed matching patterns—areas where "a line may not meet another line" and the two comparison items therefore bore little, if any, similarity to one another.  J.A. 2161, 2168; *see also* J.A. 2178, 2180-83. For example, in a photo of two comparator bullets, shown below, he acknowledged "[t]here [were] some lines that are in the bottom half on the left-hand side that are not necessarily very—there is not necessarily as many corresponding lines on the right half."  J.A. 2174.

16



J.A. 2556.

When asked by government counsel to account for these

inconsistencies, Mr. McVeigh merely asserted that, in his view, they were

immaterial:

> To my—to my eye, that is—this is a fairly consistent pattern
> agreement.  There is—we do not, however, say the word
> "perfect."  We don't say the word "match" because the firing of
> a gunpowder cartridge in a chamber in a firearm and a bullet
> through a barrel are very dynamic events. . . . It's the question
> of how much dissimilarity becomes too much when you have
> consistent agreement and consistency such as depicted here.

17

J.A. 2164.  Mr. McVeigh did not offer any explanation of why the

inconsistencies in the government's photos were not "too much."  Instead,

he simply described those inconsistencies as "normal," without explaining

when dissimilarities become so great as to be abnormal.  J.A. 2168.

Government counsel later asked a similar question about a different

photo, and received a similar response:

> Q.    I see an area down here on the test fire—is this still the
> test fire side—
>
> A.    Yes.
>
> Q.     —that does not seem to have consistent toolmarks
> corresponding on the—on the evidence.
>
>     Can you please explain why that might be or what you
> saw?
>
> A.    Why it might be would be speculation on my part other
> than just to generally say each bullet, each cartridge case does
> not, they are not identical.  They are not literally, in every facet,
> identical.  There is variation.  It can be down to a couple factors
> that I cited.
>
> . . .
>
>     I mentioned, with regard to this image, that that
> dissimilarity is not concerning to me . . .

J.A. 2180.

18

Mr. McVeigh testified that in comparing two bullets, he looks for "sufficient agreement," J.A. 2168, but he did not tell the jury why he believed the agreement in the government's photos was sufficient—or even *that* it was sufficient. Likewise, in dismissing the inconsistencies in one photo, he asserted, without further elaboration, "that's not uncommon and that was not alarming to me." J.A. 2174; *see also* J.A. 2177 ("To have some dissimilarity closer to the apex of the land impression does not—it does not flag to me, in my experience of having done over 1,000 of these cases, as significantly dissimilar."). He acknowledged he could have, but had not, shown the jury an example of two items "where the dissimilarity was too great"—information that could have been helpful in assessing the reliability of his conclusions. J.A. 2191-92.

On cross-examination, Mr. McVeigh agreed the discipline of pattern-matching firearms is "subjective." J.A. 2167-68, 2185. Indeed, he testified there is "no set number" of patterns that must match, or requisite percentage of consistencies that must exist, in order for an examiner to declare a match between two items. J.A. 2185-86, 2188.

19

### 3.    Cell phone evidence

The government also called Richard Fennern, an agent with the Federal Bureau of Investigation's Cellular Analysis Survey Team, to testify as an expert in the field of historical cell site data.  J.A. 2031, 2038.  Agent Fennern explained that cell phones are constantly scanning their surrounding environments, looking for a connection to the cell tower with "the strongest and clearest signal."  J.A. 2045.  When a phone makes or receives a call, it connects to that tower, which is usually, though not always, the tower closest to the phone.  J.A. 2045.  Towers have three transmitters at the top, each of which is responsible for servicing a 120-degree wedge—known as a "sector"—of the tower's circular coverage area.  J.A. 2041-43.  The government introduced the following image to demonstrate the point:



J.A. 2542.

Each time a cell phone makes or receives a call, the service provider records the time and date of the call, the call's duration, the tower the phone pinged, and the sector of that tower to which the phone connected. J.A. 2042, 2046. Using these data, Agent Fennern testified, an analyst can determine the "general location" of a phone at the time of a particular call. J.A. 2046.

Agent Fennern testified that he performed a historical cell-site analysis for a phone number linked to Mr. Medley. J.A. 2047-50; *see* J.A.

21

1928-29.  From the records for that number, Agent Fennern concluded the corresponding phone made three pre-carjacking phone calls on the morning of December 30, 2016.  J.A. 2060-63.

- At 9:36 a.m., the phone connected to the cell sector covering 290 37th Place in Southeast D.C.

- At 10:36 a.m., the phone connected to another sector on the same tower, located to the southeast of the first sector.

- At 10:50 a.m., the phone connected to the cell sector covering 3801 Southern Avenue in Prince George's County, the address of Mr. Wright's apartment complex.

J.A. 2058-60.

The government introduced a graphic, prepared by Agent Fennern, that depicted the locations of these cell sectors and the relevant addresses:



J.A. 2544.

In this image, each black dot represents a cell tower; the blue and red boxes
represent the locations of 290 37th Place and 3801 Southern Avenue,
respectively; and the black lines extending from the cell towers demark the
approximate boundaries of the towers' three sectors. J.A. 2059-61.

Agent Fennern explained that the shaded 120-degree wedges
depicted in those sectors do not represent the full physical size of the
sectors' coverage areas. J.A. 2061. Rather, the radius of those wedges—i.e.,
the distance from the tower to the curved line that connects two of the

23

towers' boundary lines—is an arbitrary length that he chose at random.  *See* J.A. 2061.  Agent Fennern testified that a cell sector can extend up to several miles from a cell tower and, in general, covers the area "from that tower to the next towers over."  J.A. 2068, 2081.  Therefore, he said, a connection between Mr. Medley's phone and a given cell sector means only that the phone was located somewhere between the tower containing that sector and the next tower lying within that sector's boundary lines.  J.A. 2061.  There is no way to "pinpoint within a sector where a phone is."  J.A. 2068; *see also* J.A. 2091 (". . . I can't determine exactly where that phone is.").

Agent Fennern also identified three calls made to or from the subject phone on December 30, 2016, but after the carjacking.  J.A. 2063-65.

- At 11:35 a.m., the phone connected to the cell sector covering 4850 Texas Avenue, Southeast, in D.C.

- At 1:41 p.m. and 1:59 p.m., the phone connected to a cell sector that could cover 290 37th Place.

The government introduced another graphic depicting the time and location of these calls:

24



J.A. 2546.

In addition, Agent Fennern testified that at 10:42 p.m. on December 27, 2016, and 3:03 a.m. on December 28, 2016, the subject phone connected to a cell sector covering the area of Columbia Park Road and Columbia Terrace in Landover, Maryland.  J.A. 2066; *see also* J.A. 2547.

### 4. Verdict

The jury convicted Mr. Medley of the felon-in-possession count but acquitted him of the carjacking and § 924(c) counts.  J.A. 2663-64.

## G.    Sentencing

The presentence investigation report ("PSR") assigned Mr. Medley a base offense level of 20 under U.S.S.G. § 2K2.1(a)(4)(A) based on the Probation Department's determination that Mr. Medley had one prior conviction for a "crime of violence."  S.J.A. 2777.  It then added four levels because Probation concluded, under U.S.S.G. § 2K2.1(b)(6)(B), that Mr. Medley used the Rock Island Armory in connection with another felony, namely the carjacking of Mr. Wright.  S.J.A. 2777.  A total offense level of 24 and a criminal history category IV yielded an advisory Guidelines range of 77-96 months in prison.  S.J.A. 2788.

Mr. Medley filed objections with Probation, arguing the § 2K2.1(b)(6)(B) enhancement should not apply because the government's trial evidence did not establish that Mr. Medley committed the carjacking. S.J.A. 2791.  Probation declined to amend the PSR.  *See* S.J.A. 2791.

In his sentencing memorandum, Mr. Medley reasserted his view that the district court should not apply the "in connection with" enhancement. S.J.A. 2847-49.  He argued the witnesses' descriptions of the shooter—especially that of Mr. Wright, who was familiar with Mr. Medley's

26

appearance, walk, and voice—established that it was someone other than Mr. Medley who committed the carjacking.  S.J.A. 2847-49.

The government's sentencing memorandum attached written statements from three witnesses who saw the shooter running from Mr. Wright's apartment to his car.  S.J.A. 2807-11.  One was Shawna Denton, who lived in a 15th-floor apartment in a building across the street and who had testified at trial that the shooter was "of darker complexion."  J.A. 1714-15, 1719.  In her written statement, Ms. Denton described the shooter as a "brown skin male."  S.J.A. 2807.  A second witness, April Saunders, wrote that the shooter was a "black male" of "medium complexion."  S.J.A. 2808-09.  And the third, Norma Davis, described the shooter as a "black male" having "dk complexion."  S.J.A. 2810-11.

At sentencing on October 10, 2018, the district court found, by a preponderance of the evidence, that Mr. Medley used the firearm in connection with the carjacking of Mr. Wright.  J.A. 2671-72.  Mr. Medley objected to this finding.  J.A. 2699-2700.  The court adopted the PSR's Guidelines calculations in full and sentenced Mr. Medley to 78 months in prison, to be followed by three years of supervised release.  J.A. 2682, 2717.

27

The court entered judgment the same day, and Mr. Medley filed a notice of appeal on October 24, 2018.  J.A. 2743-48, 2752.

## Summary of the Argument

Admission of Mr. Medley's statements to Detective Dalton violated his Sixth Amendment right to counsel.  Once a defendant has been appointed counsel, the government may not attempt to elicit incriminating statements in the absence of the defendant's lawyer, unless the defendant voluntarily, knowingly, and intelligently waives his right to counsel.  Mr. Medley may have waived his *Fifth Amendment* right to counsel by speaking with Detective Dalton after receiving *Miranda* warnings.  But he did not waive his *Sixth Amendment* right to counsel.  The latter right, unlike the former, is offense-specific: the Supreme Court has held that a defendant who waives his right to have counsel present for custodial interrogation regarding unindicted crimes—i.e., his Fifth Amendment right to counsel— does not thereby waive his right to counsel's presence regarding matters for which the Sixth Amendment right has already attached.

28

Here, Detective Dalton told Mr. Medley he wanted to ask questions only about his carjacking investigation in Maryland. He expressly represented that he did not wish to inquire into Mr. Medley's D.C. case. Under these circumstances, Mr. Medley did not knowingly and intelligently waive his Sixth Amendment right to counsel *in the D.C. case*. Moreover, the offense in that case is identical, for Sixth Amendment purposes, to the offense for which Mr. Medley was convicted in federal court. Both offenses involve the same elements (possession of a firearm by a felon) and were prosecuted by the same sovereign (the U.S. government). Use of Mr. Medley's statements at his federal trial therefore violated his Sixth Amendment right to counsel. Because this error was not harmless, this Court should vacate Mr. Medley's conviction and remand for a new trial.

In the alternative, this Court should remand Mr. Medley's case for resentencing. The district court erred by finding Mr. Medley committed the carjacking of Mr. Wright. The eyewitnesses' descriptions of the shooter establish that Mr. Medley could not have been the shooter, and the "in connection with" enhancement was therefore improper.

29

## Argument

### A.  Admission of Mr. Medley's statements to Detective Dalton violated his Sixth Amendment right to counsel.

#### 1.  Standard of review

When a defendant appeals the denial of a motion to suppress, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo.  *United States v. Holness*, 706 F.3d 579, 588 (4th Cir. 2013).

#### 2.  Applicable law

"The Sixth Amendment provides, in relevant part, that 'in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'"  *United States v. Cain*, 524 F.3d 477, 481 (4th Cir. 2008) (quoting U.S. Const. amend. VI).  "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the criminal proceedings."  *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009).  "Interrogation by the State is such a stage."  *Id.*  Accordingly, if the police deliberately elicit incriminating statements from a defendant "after he has

30

been indicted and in the absence of his counsel," introduction of those statements at trial violates the Sixth Amendment. *United States v. Lentz*, 524 F.3d 501, 520 (4th Cir. 2008).

Uncounseled statements may be admissible if a defendant waives his Sixth Amendment right to counsel. *Montejo*, 556 U.S. at 786. But to be valid, a waiver must be "voluntary, knowing, and intelligent." *Id.* The "voluntariness of a consent or an admission on the one hand, and a knowing and intelligent waiver on the other, are discrete inquiries." *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *see also Patterson v. Illinois*, 487 U.S. 285, 292 & n.4 (1988) (noting "the specific issue posed here is whether this waiver was a 'knowing and intelligent' waiver of [defendant's] Sixth Amendment right" and adding, in footnote, "[o]f course, we also require that any such waiver must be voluntary").

A waiver is voluntary so long as "the defendant's will has [not] been overborne or his capacity for self-determination . . . critically impaired." *United States v. Giddins*, 858 F.3d 870, 881 (4th Cir. 2017). But the knowing-and-voluntary standard is more demanding: under this test, "a waiver of the Sixth Amendment right to counsel is valid only when it

31

reflects an intentional relinquishment or abandonment of a known right or privilege." *Patterson*, 487 U.S. at 292. A defendant must be "sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel." *Id.* at 292-93. In other words, a waiver is valid only if "the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances." *Iowa v. Tovar*, 541 U.S. 77, 92 (2004) (emphasis omitted); *see also id.* at 88 ("We have described a waiver of counsel as intelligent when the defendant 'knows what he is doing and his choice is made with eyes open.'" (citation omitted)).

"To establish a valid waiver, the [government] must show that the waiver was knowing, intelligent, and voluntary under the high standard of proof for the waiver of constitutional rights." *Maryland v. Shatzer*, 559 U.S. 98, 104 (2010). This "strict standard" imposes "an appropriately heavy burden on the Government." *Schneckloth v. Bustamonte*, 412 U.S. 218, 236 (1973); *see also United States v. Gordon*, 895 F.2d 932, 940 (4th Cir. 1990) (noting "knowing and intelligent waiver" standard places "heavy burden on [the] government"). Courts should "indulge in every reasonable

32

presumption against the relinquishment of the right to counsel." *United States v. Ductan*, 800 F.3d 642, 649 (4th Cir. 2015); *see also United States v. Johnson*, 400 F.3d 187, 197 (4th Cir. 2005) ("Doubts must be resolved in favor of protecting the constitutional claim.").

In addition, the Sixth Amendment right to counsel is "specific to the offense." *United States v. Blair*, 661 F.3d 755, 772 (4th Cir. 2011).  That amendment "is limited by its terms": because it guarantees assistance of counsel "in all criminal *prosecutions*," the Sixth Amendment "does not attach until a prosecution is commenced." *Rothgery v. Gillespie Cty., Tex.*, 554 U.S. 191, 198 (2008) (emphasis added).  A defendant who has been appointed counsel for one offense does not have a Sixth Amendment right to counsel with respect to a different offense with which he has not yet been charged. *United States v. Mir*, 525 F.3d 351, 355 (4th Cir. 2006). Conversely, "when the Sixth Amendment right to counsel attaches, it does encompass offenses that, even if not formally charged, would be considered the same offense." *Texas v. Cobb*, 532 U.S. 162, 173 (2001).

Two offenses qualify as the "same offense" only if two conditions are both satisfied.  First, those offenses must consist of the same elements, as

33

determined by the double-jeopardy test from the Supreme Court's opinion in *Blockburger v. United States*, 284 U.S. 299 (1932). *Id.* Second, those offenses must be prosecuted by the same sovereign. *Holness*, 706 F.3d at 590-91.

### 3. Analysis

The government did not carry its burden of showing Mr. Medley "knowingly" and "intelligently" waived the Sixth Amendment right to counsel that attached following his arraignment in D.C. Superior Court. When he answered Detective Dalton's questions, he did so on the express understanding that he was speaking *only* about a separate investigation in Maryland—*not* about his D.C. case.

The offense in Mr. Medley's D.C. case is the same offense as the federal felon-in-possession count of which he was convicted below: both offenses involve the same elements, and both were prosecuted by arms of the federal government. Use of Mr. Medley's uncounseled statements at trial therefore violated the Sixth Amendment.

34

### a. The government did not show Mr. Medley waived his Sixth Amendment right to counsel.

Mr. Medley was appointed counsel in D.C. Superior Court on January 2, 2017, and again on January 5, 2017. J.A. 1577. The latter appointment came during his preliminary hearing, at which the court found probable cause and ordered Mr. Medley detained without bond. J.A. 1577. Thus it is clear—and the government did not dispute below—that Mr. Medley's Sixth Amendment right to counsel in his D.C. case attached no later than January 5th. *See United States v. Kennedy*, 372 F.3d 686, 692 (4th Cir. 2004) ("Th[e] right to counsel attaches upon the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."). Barring a valid waiver of that right, therefore, the government could not, at a trial for the D.C. offense, introduce any statements it deliberately elicited from Mr. Medley after January 5th. *Lentz*, 524 F.3d at 520; *Montejo*, 556 U.S. at 786.

"The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts

35

and circumstances surrounding that case, including the background, experience, and conduct of the accused." *United States v. Owen*, 407 F.3d 222, 230-31 (4th Cir. 2005).  The facts and circumstances of this case do not establish that Mr. Medley "knowingly" and "intelligently" waived his Sixth Amendment right to counsel.

Detective Dalton began the January 31, 2017 interview by introducing himself as a detective with the PGCPD—a Maryland agency.  J.A. 339, 1888.  Indeed, he expressly informed Mr. Medley he was not a member of the MPD, D.C.'s police force.  J.A. 1888.  Detective Dalton then said he "w[as]n't worried about the D.C. case" and was "not [there] to speak to [Mr. Medley] in reference to the details of his arrest in D.C."  J.A. 378, 1888. Rather, Detective Dalton explained that he was "only there to speak to [Mr. Medley] about [the] investigation in Maryland."  J.A. 378.

In the analogous Fourth Amendment context, this Court has recognized that the words used to obtain consent for a search are critical to determining whether a suspect's waiver of his right to privacy was voluntary.  When a defendant is led to believe he is consenting to a search for one purpose, but police actually intend to search for some unrelated

36

purpose, the waiver is not voluntary. *See, e.g.*, *Ferguson v. City of Charleston, S.C.*, 308 F.3d 380, 399 (4th Cir. 2002) (holding that signed forms permitting medical personnel to test appellants' urine did not provide valid Fourth Amendment consent because the forms' "relevant language" did not "advise[] or even suggest[] to Appellants that their urine might be searched for evidence of criminal activity for law enforcement purposes").

Courts must therefore "look to the circumstances of the request for consent" when determining whether the resulting consent is valid. *Id.* at 397. Likewise, the "standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of objective reasonableness— what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *United States v. Coleman*, 588 F.3d 816, 819 (4th Cir. 2009).

There is no reason not to look to the "exchange between the officer and the suspect" when deciding the validity, and scope, of a Sixth Amendment waiver, too. Indeed, the Supreme Court recognized in *Montejo* that "misrepresentations by police" can defeat a claim that a

37

suspect's waiver of his Sixth Amendment right to counsel was knowing and voluntary. 556 U.S. at 797.

Here, given Detective Dalton's representations, Mr. Medley could not reasonably have understood that by agreeing to answer questions, he was giving up his right to the presence of counsel with respect to his D.C. case. Detective Dalton did not say so expressly at the suppression hearing, but it seems reasonable to infer that he disclaimed any connection to the D.C. case precisely because he feared that, if Mr. Medley believed his statements could be used in that case, he would refuse to talk. There is no other reason Detective Dalton would go to such lengths to distance himself from the D.C. investigation.

And in any event, regardless of Detective Dalton's subjective intentions, his statements did not adequately inform Mr. Medley of "the possible consequences of a decision to forgo the aid of counsel." *Patterson*, 487 U.S. at 292-93. Nothing indicates Mr. Medley "fully underst[ood] the nature of the [Sixth Amendment] right and how it would likely apply in general in the circumstances." *Tovar*, 541 U.S. at 92 (emphasis omitted). That is, the government did not establish Mr. Medley understood that by

38

making uncounseled statements to Detective Dalton, he could be incriminating himself in his D.C. case.

The district court appears to have reasoned that because Mr. Medley was informed of, and waived, his Fifth Amendment right to counsel under *Miranda*, he also necessarily understood and waived his Sixth Amendment right to counsel. *See* J.A. 596-600. Of course, a defendant can waive his *Miranda* rights, as long as the waiver is knowing, intelligent, and voluntary. *Shatzer*, 559 U.S. at 104. But even assuming, for sake of argument, that Mr. Medley validly waived his *Miranda* rights, including the Fifth Amendment right to counsel, it does not follow that he thereby waived his Sixth Amendment right to counsel as well.

The Supreme Court has held that the two counsel rights serve distinct functions:

> The purpose of the Sixth Amendment counsel guarantee—and hence the purpose of invoking it—is to protect the unaided layman at critical confrontations with his expert adversary, the government, *after* the adverse positions of government and defendant have solidified *with respect to a particular alleged crime*. The purpose of the [Fifth Amendment] guarantee, on the other hand—and hence the purpose of invoking it—is to protect a quite different interest: the suspect's desire to deal with the police only through counsel.

39

*McNeil v. Wisconsin*, 501 U.S. 171, 177-78 (1991) (first emphasis in original);
*see also Holness*, 706 F.3d at 593-94 (citing *McNeil*).

It is therefore possible, the Court explained, for a defendant to stand
on his Sixth Amendment right to counsel while at the same time waiving
his Fifth Amendment right to counsel during the same interrogation: "To
invoke the Sixth Amendment interest is, as a matter of *fact, not* to invoke
the [Fifth Amendment] interest.  One might be quite willing to speak to the
police without counsel present concerning many matters, *but not the matter
under prosecution*."  *McNeil*, 501 U.S. at 178 (last emphasis added).

Although it may be "*likely* that one who has asked for counsel's
assistance in defending against a prosecution would want counsel present
for all custodial interrogation, even interrogation unrelated to th[at]
charge," that is "not necessarily true."  *Id.* (emphasis in original).  A
defendant might be willing to discuss unindicted offenses, for instance,
because he "believe[s] that [he] can avoid the laying of charges by
demonstrating an assurance of innocence through frank and unassisted
answers to questions."  *Id.*; *see also, e.g.*, *Gore v. Sec'y for Dep't of Corrs.*, 492
F.3d 1273, 1301 (11th Cir. 2007) (noting that a defendant who is represented

40

by counsel in one matter may, without waiving his Sixth Amendment

right, waive his Fifth Amendment right to counsel with respect to other

matters by speaking to police).

*McNeil* describes perfectly the facts of this case. The D.C. Superior

Court appointed an attorney, Ms. Carney, to represent Mr. Medley at his

January 2, 2017 presentment. Even assuming this passive acceptance of

counsel was insufficient to trigger Mr. Medley's Sixth Amendment right to

counsel—which he does not concede—he actively asserted that right on

January 5th when he asked the Superior Court to appoint Mr. McCants in

Ms. Carney's stead. When he spoke to police on January 31st, he did so

under the impression that Detective Dalton would be asking exclusively

about an investigation into a separate offense occurring in a separate

jurisdiction—and not about the D.C. case. Thus the most reasonable

reading of the record is that, as the Court described in *McNeil*, Mr. Medley

asserted his Sixth Amendment, but not Fifth Amendment, right to counsel

because he was "quite willing to speak to the police without counsel

present concerning many matters, but not the matter under prosecution,"

i.e., the D.C. case. 501 U.S. at 178.

41

Although it is not entirely clear, the district court may have premised

its dual-waiver conclusion on the following passages from *Montejo*, a case

the court discussed in its ruling:

> As a general matter . . . an accused who is admonished with the
> warnings prescribed by this Court in *Miranda* . . . has been
> sufficiently apprised of the nature of his Sixth Amendment
> rights, and of the consequences of abandoning those rights, so
> that his waiver on this basis will be considered a knowing and
> intelligent one.
>
> . . . Since the right under both sources is waived using the same
> procedure, doctrines ensuring voluntariness of the Fifth
> Amendment waiver simultaneously ensure the voluntariness of
> the Sixth Amendment waiver.

556 U.S. at 786-87, 795 (first and second ellipses in original).

To the extent the district court relied on these passages, it overlooked

a crucial distinction between this case and *Montejo*.  Police in that case

arrested the defendant on a murder charge and, following appointment of

counsel at an initial appearance, traveled to the jail to ask the defendant

questions about the murder.  *Montejo*, 556 U.S. at 781.  After receiving

*Miranda* warnings, the defendant agreed to talk to the detectives and

subsequently made incriminating statements.  *Id.* at 781-82.  The Supreme

Court held introduction of those statements at trial did not violate either

42

the defendant's Fifth or Sixth Amendment rights, since he had waived both by talking to detectives. *Id.* at 795, 798-98.

Unlike in this case, however, the Fifth and Sixth Amendment rights the defendant waived in *Montejo* related to the same offense. Because he had already been indicted on the murder charge, the *Montejo* defendant had a Sixth Amendment right to counsel on that charge. And because he was subject to custodial interrogation regarding the murder, he also had a Fifth Amendment right to counsel on that same charge. There were no other offenses about which police sought to interview him. Thus the relevant right in that case—i.e., "the right to have counsel during custodial interrogation . . . once the adversary judicial process has begun"—"happen[ed] to be guaranteed . . . by *two* sources of law." *Id.* at 795 (emphasis in original). It was in this context, where the defendant's Fifth and Sixth Amendment rights were coextensive, that the *Montejo* Court held a waiver of the former constituted a waiver of the latter.

Mr. Medley's case is different. As explained above, he had a Sixth Amendment right with respect to the D.C. offense—which he did not waive—and a Fifth Amendment right with respect to other offenses—

43

which this Court can assume, for sake of argument, that he did waive. The Supreme Court has rejected the idea that "all Sixth Amendment challenges to the conduct of postindictment questioning will fail whenever the challenged practice would pass constitutional muster under *Miranda*." *Patterson*, 487 U.S. at 296 n.9. Because "the Sixth Amendment's protection of the attorney-client relationship . . . extends beyond *Miranda*'s protection of the Fifth Amendment right to counsel, there will be cases where a waiver which would be valid under *Miranda* will not suffice for Sixth Amendment purposes." *Id.* This is such a case.

This Court must "indulge in every reasonable presumption against the relinquishment of the right to counsel," *Ductan*, 800 F.3d at 649, and resolve "[d]oubts . . . in favor of protecting the constitutional claim," *Johnson*, 400 F.3d at 197. Even without indulging such doubts, this Court can conclude the government has not carried its "heavy burden" of showing Mr. Medley knowingly and intelligently waived his Sixth Amendment right to counsel. *Gordon*, 895 F.2d at 940.

44

> **b.    The D.C. offense is the same offense as the felon-in-possession offense of which Mr. Medley was found guilty in the District of Maryland.**

As explained above, the Sixth Amendment bars admission of uncounseled statements if the offense for which the defendant is on trial is the "same offense" as the offense for which he had been indicted at the time of interrogation. *Cobb*, 532 U.S. at 167. Two offenses are the "same offense" only if they (1) require proof of the same elements, and (2) are prosecuted by the same sovereign.

Both conditions are satisfied here, and the district court therefore erred in declining to suppress Mr. Medley's statements.

> **i.    The D.C. offense has the same elements as the federal felon-in-possession statute.**

To determine whether two offenses are the same for Sixth Amendment right-to-counsel purposes, courts apply the double-jeopardy test the Supreme Court announced in *Blockburger*. *Cobb*, 532 U.S. at 173. Under that test, two offenses are separate if "each . . . requires proof of a

fact which the other does not." *Holness*, 706 F.3d at 590. Otherwise, they are the same. *Id.*; *see also United States v. Dixon*, 509 U.S. 688, 696 (1993).

D.C.'s felon-in-possession statute, under which Mr. Medley was charged in Superior Court, provides, "No person shall own or keep a firearm, or have a firearm in his or her possession or under his or her control, within the District of Columbia, if the person . . . [h]as been convicted in any court of a crime punishable by imprisonment for a term exceeding one year." 22 D.C. Code § 4503(a)(1). To secure a conviction under this statute, the prosecution "must show that 1) the defendant had been convicted of a felony and 2) that he owned or kept a firearm, or that he had a firearm in his possession or under his control." *Dorsey v. United States*, 154 A.3d 106, 112 (D.C. 2017). The prosecution must also prove the defendant possessed the firearm "knowing[ly]." *Myers v. United States*, 56 A.3d 1148, 1149 (D.C. 2010).

The federal felon-in-possession statute, which underlies count three of the indictment in the instant case, makes it illegal for anyone "who has been convicted in any court of[] a crime punishable by imprisonment for a term exceeding one year" to "possess in or affecting commerce, any firearm

46

or ammunition." 18 U.S.C. § 922(g)(1). Under this statute, the government

must prove three elements:

> (1) the defendant previously had been convicted of a crime
> punishable by a term of imprisonment exceeding one year;
> (2) the defendant knowingly possessed, transported, shipped,
> or received, the firearm; and (3) the possession was in or
> affecting commerce, because the firearm had travelled in
> interstate or foreign commerce at some point during its
> existence.

*United States v. Gilbert*, 430 F.3d 215, 218 (4th Cir. 2005).

The D.C. statute does not "require[] proof of a fact which the [federal

statute] does not." *Holness*, 706 F.3d at 590. Every fact that must be proven

under § 4503(a)(1)—i.e., that a defendant is a convicted felon, and that he

knowingly possessed a firearm—must also be proven under § 922(g)(1).

These two statutes therefore define the "same offense" within the meaning

of *Blockburger*. *Id.*

The federal statute, unlike the D.C. statute, requires proof that the

firearm moved in interstate commerce. But this fact does not render the

two statutes' offenses separate for Sixth Amendment purposes. Two

offenses are separate only if "each" requires proof of a fact that the other

does not. *Holness*, 706 F.3d at 590; *Dixon*, 509 U.S. at 696. If one offense is a

47

lesser-included offense of another, they are the same under *Blockburger*, regardless of the order in which they are prosecuted. *Rutledge v. United States*, 517 U.S. 292, 297 (1996); *Brown v. Ohio*, 432 U.S. 161, 169 (1977) ("Whatever the sequence may be, the Fifth Amendment forbids successive prosecution and cumulative punishment for a greater and lesser included offense."). The D.C. offense and the federal offense—the former of which is a lesser-included offense of the latter—are therefore the "same" for Sixth Amendment right-to-counsel purposes.

It is also irrelevant that the complaint in Mr. Medley's D.C. Superior Court case alleges he possessed the Rock Island Armory on December 31, 2016, whereas the indictment in the instant cases alleges possession on the previous day, December 30, 2016. *See* J.A. 4, 1557-58. Possession of a firearm by a felon is a "continuing offense[] because the federal gun control statute punishes the *possession* and not merely the *acquisition* of a firearm." *United States v. Maxim*, 55 F.3d 394, 397 (8th Cir. 1995) (emphasis in original). Accordingly, the "offense continues to be committed as long as the felon continues to be in possession." *United States v. Dillard*, 214 F.3d 88, 94 n.5 (2d Cir. 2000); *see also United States v. Goodwin*, 552 F. App'x 541,

48

545 (6th Cir. 2014) (unpublished) ("Possession of a firearm is a continuing offense that ceases only when the felon relinquishes possession.").

"Where there is no proof that possession of the same weapon is interrupted," therefore, "the Government may not arbitrarily carve a possession into separate offenses." *United States v. Benjamin*, 711 F.3d 371, 378 (3d Cir. 2013); *see also United States v. Jones*, 127 A.3d 1173, 1192 (D.C. 2015) (holding no special unanimity jury instruction required for felon-in-possession case where evidence shows "a continuing course of conduct, rather than a succession of clearly detached incidents").

Here, the government offered no evidence that Mr. Medley relinquished possession of the Rock Island Armory between when he allegedly possessed it on December 30th and when he possessed it on the 31st. Mr. Medley's alleged possession of the firearm in Maryland on the 30th is therefore the same, single, continuing offense as his alleged possession in D.C. a day later.

49

### ii.    The D.C. Superior Court case was prosecuted by the same sovereign as the District of Maryland case.

A "central feature" of the same-offense definition is the "dual sovereignty doctrine." *United States v. Alvarado*, 440 F.3d 191, 196 (4th Cir. 2006). Under this doctrine, "a single act gives rise to distinct offenses . . . if it violates the laws of separate sovereigns." *Puerto Rico v. Sanchez Valle*, 136 S. Ct. 1863, 1867 (2016). Two prosecutions are not for the "same offense," in other words, "if brought by different sovereigns—even when those actions target the identical criminal conduct through equivalent criminal laws." *Id.* at 1970. But where the same conduct is prosecuted a second time by the same sovereign, those acts constitute the "same offense." *See id.* at 1873.

The "degree to which an entity exercises self-governance" and its "ability to enact and enforce its own criminal laws" are irrelevant to whether it constitutes its own sovereign for Sixth Amendment purposes. *Id.* at 1870. Rather, the separate-sovereigns test "hinges on a single criterion: the 'ultimate source' of the power undergirding the respective prosecutions." *Id.* at 1871 (citation omitted). When "identifying a

50

prosecuting entity's wellspring of authority," courts must "go[] all the way back—beyond the immediate, or even an intermediate, locus of power to what [the Supreme Court has] termed the 'ultimate source.'" *Id.* at 1875 (citation omitted). Unless two entities "draw their authority to punish the offender from distinct sources of power," they are the same sovereign. *Id.* at 1871.

Applying this test, the Supreme Court held in *Sanchez Valle* that Puerto Rico is not a separate sovereign from the United States. *Id.* at 1868. Puerto Rico is a commonwealth with a constitution establishing a tri-partite government like the states', and it passes criminal laws pursuant to that constitution, much as the states do. *Id.* at 1869. It even enjoys "a measure of autonomy comparable to that possessed by the States." *Id.* at 1874. But Puerto Rico obtained the authority to create that constitution only because Congress bestowed it by statute. *Id.* at 1875. Thus Congress is "the original source of power for Puerto Rico's prosecutors—as it is for the Federal Government's." *Id.* at 1875-76.

The same logic applies to D.C. "The Constitution grants Congress the power 'to exercise exclusive Legislation in all Cases whatsoever, over

51

such District (not exceeding ten Miles square) as may . . . become the Seat of the Government of the United States.'" *United States Ass'n of Reptile Keepers, Inc. v. Zinke*, 852 F.3d 1131, 1140 (D.C. Cir. 2017) (quoting U.S. Const. art. I, § 8, cl. 17). This provision gives Congress "unique authority over the District of Columbia." *Id.* Congress exercised this authority in the Home Rule Act, which "delegated 'certain legislative powers to the government of the District of Columbia.'" *Id.* (quoting Pub. L. No. 93-198, 87 Stat. 774, 777 (1973)). When the D.C. government enacts criminal laws, it does so pursuant to this congressional delegation of authority. *See Heller v. District of Columbia*, 670 F.3d 1244, 1250-51 (D.C. Cir. 2011). Thus the "ultimate source of [D.C.'s] prosecutorial power," just like Puerto Rico's, "remains the U.S. Congress." *Sanchez Valle*, 136 S. Ct. at 1875.

Consistent with this authority, the D.C. Circuit has recognized that D.C. and the federal government are the same sovereign for double-jeopardy purposes (and thus for Sixth Amendment right-to-counsel purposes). *E.g.*, *United States v. Weathers*, 186 F.3d 948, 951 n.3 (D.C. Cir. 1999) ("Although the Double Jeopardy Clause does not bar multiple punishments under federal and state law, a defendant may not be

52

punished twice for the same offense under both the United States Criminal Code and the District of Columbia Criminal Code because both were adopted by Congress."); *United States v. Sumler*, 136 F.3d 188, 191 (D.C. Cir. 1998) ("A person acquitted of a crime under District law may not be charged with that same crime under federal law in a successive prosecution (or vice versa); the same sovereign may not take a second bite at the apple."); *United States v. Robertson*, 810 F.2d 254, 257 (D.C. Cir. 1987) ("Two distinctions may be urged between the state-federal relation and the District-federal one. First, the states are independent sovereigns, while the District most assuredly is not. . . .").

This Court should reach the same conclusion and therefore hold that introduction of Mr. Medley's uncounseled statements violated the Sixth Amendment.

**c.    This Court should vacate Mr. Medley's conviction and remand for a new trial.**

When the district court commits a constitutional error, this Court must reverse unless the error is harmless. *United States v. Garcia-Lagunas*, 835 F.3d 479, 487-88 (4th Cir. 2016). A constitutional error is harmless only

53

if, "viewing the entire record, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict absent the . . . error." *Id.* at 488. "The burden rests on the government, the beneficiary of the error, to show harmlessness." *Id.*

The government will be unable to bear its burden in this case.

The indictment alleges Mr. Medley possessed the Rock Island Armory "[o]n or about December 30, 2016, in the District of Maryland." J.A. 4. At trial, the government attempted to prove this charge by pointing to two alleged instances of firearm possession in Maryland. The first involved Mr. Medley's alleged purchase of the Rock Island Armory in Landover on December 27, 2016, four days before he was arrested. The second involved the carjacking of Mr. Wright in Prince George's County on the 30th. *See* J.A. 2314 (asserting in closing argument that jury could "rely on" either of "two separate incidents" of gun possession, on the 27th and 30th).

Without Mr. Medley's statements from the January 31, 2017 interrogation, there is no evidence that he bought, or otherwise possessed, a gun in Maryland on December 27th. The only other evidence pertaining

54

to that date that the government introduced at trial was testimony from Agent Fennern, the cell site expert, that a phone tied to Mr. Medley was in the area of Columbia Park Road and Columbia Terrace on the night of the 27th and the early morning of the 28th. By itself—without Mr. Medley's statement that he bought a gun in that area around that time—this evidence does nothing to establish Mr. Medley possessed a firearm.

That leaves the evidence of the carjacking. The government asked the jury to conclude Mr. Medley committed the carjacking, and therefore necessarily possessed a firearm in Maryland on the 30th. *See, e.g.*, J.A. 2318-21. But the jury rejected this argument, finding Mr. Medley not guilty of the carjacking and § 924(c) charges. If the jury did not believe Mr. Medley committed those crimes on December 30th, it could not have believed he possessed a gun in Maryland on that date, since the government presented no other evidence of possession on the 30th. The government therefore cannot establish—much less establish "beyond a reasonable doubt"—that, absent Mr. Medley's uncounseled statements, the jury would have convicted Mr. Medley of the felon-in-possession count. *Garcia-Lagunas*, 835 F.3d at 488.

55

This Court should vacate Mr. Medley's conviction and remand for a new trial.

### B. The district court erred by finding Mr. Medley used the firearm in connection with another felony.

#### 1. Standard of review

"In reviewing whether a sentencing court properly calculated the Guidelines range, [this Court] review[s] the court's factual findings for clear error and its legal conclusions de novo." *United States v. Shephard*, 892 F.3d 666, 670 (4th Cir. 2018).

An error is clear if, "on the entire evidence," the reviewing court "is left with the definite and firm conviction that a mistake has been committed." *United States v. Span*, 789 F.3d 320, 325 (4th Cir. 2015). "In other words, clear error occurs when a district court's factual findings are against the clear weight of the evidence considered as a whole." *Id.*

#### 2. Analysis

Under the guideline applicable to felon-in-possession cases, the sentencing court should add four offense levels if it finds, by a preponderance of the evidence, that the defendant "used or possessed any

56

firearm or ammunition in connection with another felony offense."
U.S.S.G. § 2K2.1(b)(6)(B); *see United State v. Slager*, 912 F.3d 224, 233 (4th Cir.
2019) (preponderance standard).  The district court's application of this
enhancement, based on its finding that Mr. Medley used the Rock Island
Armory to carjack Mr. Wright, was clearly erroneous.

At trial and at sentencing, Mr. Medley did not contest that *someone*
committed a carjacking of Mr. Wright.  J.A. 2337; S.J.A. 2848.  But he
pointed to substantial evidence demonstrating that he was not that
someone.

Mr. Wright was the only witness who observed Mr. Wright up
close—or even from ground level.  S.J.A. 2848.  He was also familiar with
Mr. Medley: he had known Mr. Medley for roughly three years at the time
of the shooting and used to see him two to three times per week.  J.A. 1812-
13, 1822.  Mr. Wright testified he had heard Mr. Medley speak and said it
would be "easy" for him to recognize Mr. Medley.  J.A. 1823.
Notwithstanding this familiarity—and despite "paying attention" to the
shooter—Mr. Wright said he did not recognize the shooter's appearance,
his walk, or his voice.  J.A. 1826, 1828-29, 1831.

57

Mr. Wright also offered a physical description that did not match Mr. Medley. Mr. Wright said he and the shooter—whose "body size" he was able to observe—were about the same size. J.A. 1834-35. At the time of the carjacking, Mr. Wright wore a pants size 44, which corresponds roughly to a weight of 220-250 pounds. J.A. 1843; *see* Obliteride, Men's Sizing, http://www.obliteride.org/pdfs/voler-sizing-charts (last visited Mar. 4, 2019). Mr. Medley, by contrast, weighed between 155 and 170 pounds at the time. S.J.A. 2961. If Mr. Wright was about the same size as the shooter, and if Mr. Wright weighed in excess of 220 pounds, there is no way the shooter could have been Mr. Medley, who was somewhere between 50 and 95 pounds lighter. Indeed, Mr. Wright agreed Mr. Medley was "[m]uch smaller" than Mr. Wright—and therefore much smaller than the shooter, who appeared "bulky." J.A. 1842-43.

Other witnesses' descriptions of the shooter at trial also failed to match Mr. Medley:

- Detective Dalton testified that witnesses estimated the shooter weighed between 200 and 250 pounds. J.A. 1890-91, 1913. Mr. Medley, by comparison, weighed roughly 155-170 pounds, and

58

his ex-girlfriend described him as "skinny."  J.A. 1935; S.J.A. 2961.

- Witnesses told Detective Dalton that the shooter was between 5'11" and 6'2".  J.A. 1891, 1914.  Mr. Medley stands between 5'9" and 5'10".  S.J.A. 2961.

- Both Shawna Denton and other witnesses who spoke to Detective Dalton described the shooter as being "dark-skinned" or having a "darker complexion."  J.A. 1719, 1890.  But Mr. Medley is "light-skinned," according to Mr. Wright's testimony.  J.A. 1837.

In light of these significant physical differences—in weight, height, and skin tone—the district court's conclusion that Mr. Medley shot Mr. Wright is "against the clear weight of the evidence considered as a whole."  *Span*, 789 F.3d at 325.

The government sought at sentencing to dismiss these discrepancies by introducing written statements from Ms. Denton and two other witnesses, April Saunders and Norma Davis.  S.J.A. 2800.  Ms. Davis described the shooter as a "black male" of "dk complexion."  S.J.A. 2810-11.

59

Assuming "dk" is an abbreviation for "dark," Ms. Davis' statement does nothing to suggest Mr. Medley shot Mr. Wright. Indeed, it reinforces the conclusion that Mr. Medley, who is "light-skinned," cannot have been the shooter. J.A. 1837.

The other two statements are only minimally more helpful for the government. Ms. Denton wrote that the shooter was a "brown skin male." S.J.A. 2807. To the extent this ambiguous statement suggests the shooter was light-skinned, like Mr. Medley, it contradicts Ms. Denton's trial testimony, in which she said the shooter was "of darker complexion." J.A. 1719. Mr. Medley acknowledges that "a sentencing court may consider any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Umana*, 750 F.3d 320, 436-47 (4th Cir. 2014). But where a witness has made two contradictory statements—one an unsworn, un-cross-examined hearsay statement, and the other a statement made under oath while the witness is subject to cross-examination—it is unreasonable to credit the former over the latter. Ms. Denton's written

60

statement therefore does little, if anything, to link Mr. Medley to the carjacking.

As for Ms. Saunders, she wrote that the shooter was a "black male" of "medium complexion." S.J.A. 2808-09. This statement is, at most, minimally supportive of the government's view that Mr. Medley was the shooter. And there are reasons to be skeptical of it. Ms. Saunders observed the shooter from the window of her unit in the Ashton Heights Apartments, a high-rise building across the street from Mr. Wright's apartment complex. *See* J.A. 1720-21; S.J.A. 2808. She therefore lacked a vantage point from which to observe the shooter closely. And Ms. Saunders' statement was never subject to cross-examination, rendering it of limited reliability. *See Sam's Club v. N.L.R.B.*, 173 F.3d 233, 241 (4th Cir. 1999) ("[A] presumption of unreliability applies to hearsay evidence."); *Ellison v. Sachs*, 769 F.2d 955, 957 (4th Cir. 1985) (noting "the care with which courts must approach the question of introducing . . . hearsay, particularly when largely untested by cross-examination").

In finding Mr. Medley committed the carjacking, the district court also relied on two other pieces of evidence: Mr. McVeigh's firearm

61

toolmark testimony and Agent Fennern's cell site testimony.  J.A. 2671-72. Given the substantial differences between Mr. Medley and the witnesses' descriptions of the shooter, this expert testimony is insufficient to support a finding that Mr. Medley was the carjacker.

Mr. McVeigh testified that the class characteristics of the Rock Island Armory were the same as those of the gun used to commit the carjacking, which means the two firearms were of the same model.  J.A. 2137-38, 2163. He did not opine, however, that the two firearms' individual characteristics, or even subclass characteristics, were a "match."  Nor did he even explain how many consistencies two items must share before analysts can declare a match.  J.A. 2185-86, 2188.  The field of firearm toolmark analysis, he conceded, is "subjective."  J.A. 2167-68, 2185.

Instead of declaring a match, Mr. McVeigh limited his testimony to pointing out several places where the two sets of bullets and cartridges bore similar markings.  *E.g.*, J.A. 2160-62, 2172-74.  But he acknowledged that many of the side-by-side photographs from his microscope showed "breaks" in the two items' patterns.  J.A. 2161, 2168.  When asked to explain why these discontinuities did not suggest the items came from different

62

guns, he merely asserted, in conclusory fashion, that they were "normal" and that he did not find them "concerning" or "alarming." J.A. 2168, 2174, 2180.

Mr. McVeigh further testified that bullets fired from the same gun will bear some dissimilarities, and bullets from different guns will have some patterns in common. J.A. 2186-87. Thus Mr. McVeigh's testimony does little more than establish that the carjacker used a gun of the same model as Mr. Medley's. This fact has scant probative value.

As for the cell site testimony, Agent Fennern acknowledged that he cannot pinpoint where exactly, within a cell sector's coverage area, a phone is located. J.A. 2068, 2092. A cell sector can extend out several miles from the cell tower. J.A. 2068. Accordingly, Agent Fennern's testimony about the subject phone—i.e., that it was in the same "general location" as Mr. Wright's apartment 30 minutes before the carjacking—has only minimal probative value in identifying Mr. Medley as the shooter. J.A. 2046.

* * * *

The eyewitness accounts—especially that of Mr. Wright, who knew Mr. Medley personally and who had the opportunity to observe the

63

shooter at close range—establish that Mr. Medley did not commit the

carjacking of Mr. Wright.  The district court clearly erred by finding

otherwise.  This Court should therefore vacate Mr. Medley's sentence and

remand for a resentencing at which the district court does not apply the "in

connection with" enhancement.  *See United States v. Wilkinson*, 590 F.3d 259,

268-69 (4th Cir. 2010) (explaining that "improperly calculating advisory

Guidelines sentencing range constitutes procedural error in sentencing

which requires remand for resentencing").

### C.    The district court violated Mr. Medley's Sixth Amendment right to a jury trial by sentencing him based on acquitted conduct.

"The Sixth Amendment provides, in relevant part, that 'the accused

shall enjoy the right to a . . . trial by an impartial jury.'"  *Robinson v. Polk*,

438 F.3d 350, 359 (4th Cir. 2006) (quoting U.S. Const. amend. VI).  When, as

in this case, a district court enhances a defendant's sentence based on a

finding that the defendant committed conduct of which the jury acquitted

him, the court violates the defendant's Sixth Amendment right to a jury

trial.

"[A]llowing a judge to dramatically increase a defendant's sentence based on jury-acquitted conduct is at war with the fundamental purpose of the Sixth Amendment's jury-trial guarantee," which is designed to "guard against a spirit of oppression and tyranny on the part of rulers." *United States v. Bell*, 808 F.3d 926, 929 (D.C. Cir. 2015) (Millett, J., concurring in the denial of rehearing en banc). "Accordingly, before depriving a defendant of liberty, the government must obtain permission from the defendant's fellow citizens, who must be persuaded themselves that the defendant committed each element of the charged crime beyond a reasonable doubt." *Id.* at 930. If a judge can sentence a defendant based on acquitted conduct, then "the jury is largely relegated to making a determination that the defendant at some point did something wrong, a mere preliminary to a judicial inquisition into the facts of the crime the State *actually* seeks to punish at sentencing." *Id.* (emphasis in original).

Such a system violates the Sixth Amendment because it represents "too deep of an incursion into the jury's constitutional role." *Id.*; *see also id.* at 928 (Kavanaugh, J., concurring in the denial of rehearing en banc) ("Allowing judges to rely on acquitted or uncharged conduct to impose

65

higher sentences than they otherwise would impose seems a dubious infringement of the rights to due process and to a jury trial."). The district court in this case therefore violated Mr. Medley's Sixth Amendment right to a jury trial by enhancing his sentence based on a finding that he used a firearm to carjack Mr. Wright—a charge of which the jury acquitted him.

Mr. Medley acknowledges that binding case law forecloses this argument. *United States v. Watts*, 519 U.S. 148, 155-56 (1997); *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012). Nevertheless, he includes it here for purposes of preservation.

## Conclusion

Because the violation of Mr. Medley's Sixth Amendment rights was not harmless, this Court should vacate his conviction and remand for a new trial. In the alternative, this Court should vacate his sentence and remand for a resentencing at which the district court does not apply the U.S.S.G. § 2K2.1(b)(6)(B) enhancement.

James Wyda
Federal Public Defender
Cullen Macbeth
Assistant Federal Public Defender
100 S. Charles Street
Tower II, 9th Floor
Baltimore, MD 21201
(410) 962-3962


/s/ Cullen Macbeth
Cullen Macbeth

## Statement Regarding Oral Argument

Counsel for Appellant respectfully requests oral argument so that the issues above can be more fully presented for the Court's consideration.

## Certificate of Compliance

1. This brief has been prepared in Microsoft Word using 14-point, proportionally spaced, serif typeface.

2. Excluding the items identified in Federal Rule of Appellate Procedure 32(f), this brief contains 11,904 words.

/s/ Cullen Macbeth
Cullen Macbeth
Assistant Federal Public Defender

69

## Certificate of Service

I certify that on March 6, 2019, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will send notice of such filing to the following registered CM/ECF users: Bryan Foreman, Christian Nauvel, and Thomas Sullivan, Assistant United States Attorneys, Office of the United States Attorney, 6406 Ivy Lane, Greenbelt, MD 20770.

/s/ Cullen Macbeth
Cullen Macbeth
Assistant Federal Public Defender

70